# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 38878

CRAIG E. PETERSON and JANICE K. PETERSON, husband and wife,

    Plaintiffs-Counterdefendants-
    Respondents,

v.

WESLEY J. GENTILLON and CONNIE GENTILLON, husband and wife; LAMON M. GENTILLON and LORI FAYE GENTILLON, husband and wife,

    Defendants-Counterclaimants-Third Party Plaintiffs-Appellants-Cross Respondents,

and

MARCEL GENTILLON and DORIS GENTILLON, husband and wife,

    Third Party Defendants-Respondents-Cross Appellants,

and

SCOTT GENTILLON and DORIS GENTILLON, husband and wife,

    Third Party Defendants-Cross Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Idaho Falls, November 2012

2013 Opinion No. 30

Filed: February 26, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bingham County. Hon. Jon J. Shindurling, District Judge.

District court decision on quiet title action, <u>reversed</u>.

Baker & Harris, Blackfoot, for appellant. Dwight E. Baker argued.

Manwaring Law Office, Idaho Falls, for respondents Petersons. Kipp L. Manwaring argued.

1

Rigby, Andrus & Rigby, Chtd., Rexburg, for respondents Marcel and Doris Gentillon. Hyrum D. Erickson argued.

---

BURDICK, Chief Justice

Appellants Lamon "Mont" and Lori Gentillon as well as Wes and Connie Gentillon (the Partnership) appeal from the district court's order granting title to all but .34 acres of a disputed parcel of land and a 30-foot easement in favor of Craig and Janice Peterson (the Petersons) in an action to quiet title to certain portions of riparian and agricultural land in Bingham County, Idaho. In 1998, the Partnership entered into a three-party agreement in which they purchased the majority of Scott and Tracy Gentillon's farm and were to exchange three small parcels of land with Marcel and Doris Gentillon (the Gentillons) following a survey of the land. The survey was completed in 1999 and revealed boundary problems that led to further land exchanges between the Gentillons and the Partnership. In 2006, the Gentillons sold their homestead to the Petersons by a warranty deed that did not reflect the Gentillons' land exchanges with the Partnership. The Petersons then brought the action to quiet title to the property they had acquired by deed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Prior to 1991 the Gentillons owned approximately 80 acres of riparian and agricultural land bordered on the east by the Snake River. This land was made up of several parcels: Lot 1, Section 24 (Lot 1) consisting of approximately 69 acres of farmland; BLM Lot 1, Section 19 (BLM Lot) consisting of approximately eight acres of farmland; and Lot 16 of Section 24 (Lot 16) consisting of 1.84 acres of riparian land. In 1991, the Gentillons transferred the BLM Lot and most of Lot 1 to their son Scott Gentillon. The Gentillons retained Lot 16 and a ten-acre portion of Lot 1 surrounding their home, which the district court referred to as T-10032 at trial. The Partnership then began to lease the farmland and riparian land from Scott Gentillon.

In December 1998, the Partnership contracted with Scott Gentillon to purchase his farm for $200,000. To facilitate the sale of Scott's farm, Scott, the Gentillons, and the Partnership all entered into an "Agreement for Exchange of Property and Option" (1998 Agreement). Under this agreement the Gentillons would exchange Lot 16 and land sufficient for the Partnership to install and operate a center pivot irrigation system for land east of the pivot point that would be least disruptive to the Partnership's farming. Additionally, Scott agreed to transfer his interest in the BLM Lot to the Gentillons and they agreed to transfer a portion of this lot to the Partnership

2

if needed to equalize farmable acreage. Finally, the agreement required the Partnership to pay for the survey to determine what land would be exchanged.

After receiving the $200,000 in payment, Scott executed a deed transferring his interest in Lot 1 to the Partnership. The Gentillons transferred their interest in Lot 16 to Scott, who then passed it on to the Partnership. Finally, Scott deeded his interest in the BLM Lot to the Gentillons. In January 1999 following this exchange of deeds, Darren Leavitt performed a preliminary survey and discovered that T-10032 bisected the Gentillons' house. The Partnership claims that after this boundary issue was discovered, it agreed to exchange the 0.33 acres on which the Getillon's house and garden extended into Lot 1 for an equivalent size piece of land along the southern border of T-10032. Despite the discovery of the boundary problem and the Partnership's claims that it resulted in an oral modification of the 1998 Agreement, none of the parties executed any additional deeds. The Partnership also continued to farm part of the BLM Lot that it had leased from Scott previously after he deeded this property to the Gentillons.

In September 2006, the Gentillons agreed to sell T-10032 and the BLM Lot to the Petersons. The warranty deed the Gentillons executed stated that they held the property in fee simple and without encumbrance. The Gentillons told the Petersons that the Partnership had a limited, undefined right to use the land, but did not tell the Petersons that they had previously agreed to trade some of the land to the Partnership. The district court found that Marcel Gentillon's testimony that he forgot about the previous transaction was not credible, but that the intrusion of the Partnership's circle pivot on T-10032 was or should have been obvious to all of those concerned.

In September 2007, the Petersons filed a complaint against the Partnership, seeking to take possession of the land and quiet title on the property. In October 2007, the Partnership filed a counterclaim and third-party complaint seeking damages from the Gentillons for breach of contract, specific performance, and unjust enrichment.

Following multiple hearings, the district court issued a decision denying the Partnership's motions for summary judgment on March 2, 2009. The court also granted summary judgment against the Partnership's contract claim against the Petersons on the ground that the claim was barred by the statute of limitations. On March 9, 2009, the Petersons filed a motion for summary judgment on the issues of quieting title and ejectment, which the Partnership countered by arguing that the Petersons are not bona fide purchasers of the disputed property. While the

3

district court found that the Petersons were not bona fide purchasers because of their complete failure to investigate the property, the court denied summary judgment on both parties' quiet title claims.

On August 21, 2009, the Gentillons filed a motion for summary judgment against the Partnership's claim for specific performance of the 1998 agreement, arguing that it was a remedy under the Partnership's breach of contract claim, which the court already determined was barred by the statute of limitations. Noting that it had already found the 1998 agreement to be unenforceable because of the statute of limitations, the district court found that no remedies arising solely from the contract itself existed for the Partnership and granted summary judgment in favor of the Gentillons.

The district court held a bench trial on October 20 and 21, 2009, and issued its Findings of Fact, Conclusions of Law, and Order Following Bench Trial. After the parties filed several motions to amend the judgment, the court partially granted these motions stating, "the parties should be allowed to amend or supplement their pleadings solely for the purpose of framing the issues concerning the status of the residence straddling a property line and not to amend or supplement any issue previously decided by the court." Specifically, the Gentillons and the Petersons took issue with the court's final judgment ruling that title to the garden spot on which the Petersons' home overlapped was quieted in favor of the Partnership. After a supplemental trial on December 23, 2010, the district court issued its Amended Findings of Fact, Conclusions of Law and Order. The court's Amended Findings were largely identical to its January 2010 findings except title to the garden spot was quieted in favor of the Petersons rather than the Partnership. The district court filed an Amended Final Judgment on February 22, 2011.

## II. ISSUES ON APPEAL

1. Whether the five-year statute of limitations for actions arising from contracts bars the Partnership's claim for specific performance.

2. Whether the district court erred in awarding the southern 50-foot strip of the BLM Lot to the Petersons.

3. Did the district court err in determining that the Petersons' road access easement was 30 feet wide?

4. Whether the district court erred in requiring the Partnership to prevent the pivot from casting water on the Petersons' access road.

4

5. Whether the Gentillons or the Partnership are entitled to attorney fees on appeal.

## III. STANDARD OF REVIEW

When reviewing the district court's decision, this Court determines "whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law." *Beckstead v. Price*, 146 Idaho 57, 61, 190 P.3d 876, 880 (2008). This Court will only set aside clearly erroneous findings of fact, which are findings not supported by substantial and competent evidence. *Akers v. D.L. White Constr., Inc.*, 142 Idaho 293, 298, 127 P.3d 196, 201 (2005). "Evidence is substantial if a reasonable trier of fact would accept and rely upon it in determining whether a disputed point of fact has been proven." *Id.* Furthermore, this Court gives due regard to the district court's special opportunity to judge the credibility of witnesses who personally appear before the court. *Beckstead*, 146 Idaho at 61, 190 P.3d at 880. However, this Court exercises free review over the district court's conclusions of law. *Id.*

## IV. ANALYSIS

### A. The Five-Year Statute of Limitations for Actions Arising from Contracts Does Not Bar the Partnership's Specific Performance Claim.

The Partnership argues that the district court erred in dismissing its claim for specific performance of the 1998 Agreement on summary judgment because I.C. § 5-216's five-year statute of limitations had not yet run against the claim. The Partnership urges this Court to adopt a rule that this statute of limitations does not begin to run against actions for specific performance of a contract where the claimant or vendee is in possession of the property. The district court determined that the cause of action for breach of the 1998 Agreement accrued in 1999 when the Gentillons failed to execute the deeds to the property and is now barred by I.C. § 5-216's five-year statute of limitations. The district court then dismissed the Partnership's claim for specific performance, reasoning that it was a remedy under the breach of contract claim already barred by the statute of limitations.

The district court erred by assuming that the Partnership's specific performance claim was automatically time-barred because I.C. § 5-216 barred the breach of contract claim. To the extent that the Partnership was in possession of land exchanged according to the 1998 Agreement as orally modified, the statute of limitations does not bar the Partnership's specific performance claim.

5

Idaho Code § 5-216 applies a five-year statute of limitations to actions "upon any contract, obligation or liability founded upon an instrument in writing." When previously interpreting the applicability of this provision, this Court noted that the "statute of limitations is general, is to be liberally construed, and must be applied in all cases where an exception is not specifically made." *Mendini v. Milner*, 47 Idaho 439, 440, 276 P. 313, 314 (1929). The statute of limitations only begins to run "following the accrual of a cause of action and a statute of limitations may only be asserted as a bar after the expiration of the statutory period following the accrual of the cause of action." *Singleton v. Pichon*, 102 Idaho 588, 590, 635 P.2d 254, 256 (1981).

This Court has never specifically addressed whether I.C. § 5-216 bars actions for specific performance where the claimant or vendee is in possession of the property. In an action for specific performance where the claimant was not in possession of the property, this Court held that the statute of limitations applied and began to run at the time "the cause of action accrued in the vendee." *Singleton v. Foster*, 98 Idaho 149, 151, 559 P.2d 765, 767 (1977). However, in that case, the Court explicitly noted that the vendees "did not have and never have had possession of the property in question." *Id*. at 150, 559 P.2d at 766.

Here, there is no indication that the cause of action for specific performance accrued in the Partnership when it failed to exchange deeds with the Gentillons after the survey's completion. The relevant language of the 1998 Agreement is as follows:

> 2. Marcel agrees to exchange Marcel's Riparian Land [Lot 16] for part of the Scott's Lott 1 property but agrees to convey to Wes and Mont that portion south of the south line of Parcel T10032 extended and any adjustments required under paragraph 4 when a survey is obtained.
> 3. Marcel agrees to exchange with Wes and Mont the land from the SW corner of T-10032 necessary to install a Pivot for irrigation of Scott's Farm for land east of the pivot contiguous to Parcel T-10032, least disruptive to farming patterns on the retained portion of Scott's Farm. Wes and Mont will pay for the Survey to obtain the legal descriptions for the land to be exchanged.
> 4. If survey shows that the farmable acreage in Lot 16 is more than 10% less than the farmable acreage in Lot 1 [BLM Lot], Marcel agrees to deed to Wes and Mont land to adjust the new south boundary in Lot 1 [BLM Lot] (by moving a line parallel to the south line of T-10032 north or south) so that farmable acreage in Marcel's retained portion of Lot 1 equals the farmable acreage in Section 16.

The 1998 Agreement only requires deeds to be exchanged if adjustments need to be made to the BLM lot following the survey. Thus, the Partnership's cause of action for specific

6

performance would not necessarily accrue after a failure to exchange deeds. Moreover, the district court did not address how this agreement was orally modified despite the Gentillons acknowledgment of this modification in their Closing Brief for Supplemental Trial. While it is unclear exactly how the 1998 Agreement was modified, the Gentillons did exchange land with the Partnership. There is no evidence that the Partnership was put on notice that its ownership rights in the land it actually took possession of in accordance with the terms of the agreement were in question until the Petersons filed their quiet title claim. Thus, until the Petersons brought their claim, the Partnership would have no reason to bring a specific performance claim as to the land in its possession.

Indeed, because a claimant in possession of property has little reason to bring a specific performance claim as to that property, many states have adopted a rule that statutes of limitations do not run against a claimant in possession until that possession is interrupted. *See, e.g.*, *Richards v. Richards*, 76 S.E.2d 492, 497 (Ga. 1953) ("It is well settled that neither laches nor the statute of limitations will run against one in peaceable possession of property under a claim of ownership for delay in resorting to a court of equity to establish his rights."); *Dotson v. Aldridge*, 438 S.W.2d 464, 466 (Ark. 1969) (noting rule that "there is no necessity for resorting to legal remedies until there is an interference with possession"); *Withroder v. Wiederoder*, 134 P.2d 381, 385 (Kan. 1943) (holding that the statute of limitations did not bar a quiet title action commenced eight years after execution of contract for exchange of interests because the plaintiff was in possession and could bring the action at any time at his convenience); *Martinez v. Archuleta-Padia*, 143 P.3d 1112, 1115 (Colo.App. 2006) (noting that "the general rule is that those in actual possession of real estate are never barred by any statute of limitation from seeking to quiet their title"); *Clary v. Stack Steel & Supply Co.,* 611 P.2d 80, 83 (Alaska 1980) ("Normally no statute of limitations applies to a quiet title action brought by a person in possession of real property."); *Viersen v. Boettcher,* 387 P.2d 133, 138 (Okla. 1963) (recognizing that "an action to quiet title, where the plaintiff has been in continuous possession of the property, claiming ownership therein, can be maintained at any time, and no statute of limitation bars his right to the relief sought").

We find these authorities persuasive and therefore conclude that the statute of limitations does not bar a claimant who has purchased real property and is in possession of that property from asserting a claim for specific performance. A claim for specific performance does not begin

7

to run against a claimant in possession until the claimant's possession is interrupted. Thus, the statute of limitations under I.C. § 5-216 does not bar the Partnership's claim for specific performance as to the property the Partnership had possession of in accordance with the 1998 agreement as orally modified.

**B. The District Court Erred by Awarding the Southern 50-Foot Strip of T-10032 to the Petersons.**

The Partnership argues that the district court erred by refusing to award them the southern 50-foot strip of T-10032 extending through the BLM Lot (50-foot strip) under a resulting trust theory. The Partnership contends that the court should have taken into account the parties' intentions as reflected in the 1998 Agreement in determining whether the 50-foot strip should be awarded to the Partnership, just as the court did to determine the ownership of the land under the center pivot. Alternatively, the Partnership argues that if the district court correctly awarded the 50-foot strip to the Petersons, then it erred by awarding the garden spot to the Petersons under the same theory. The Petersons respond that the 1998 Agreement does not address an adjustment to the southern 50 feet of T-10032 and that the court's finding that no adjustment was necessary is supported by substantial and competent evidence.

The alleged beneficiary of a resulting trust is required to prove the underlying facts necessary to give rise to a resulting trust by clear and convincing evidence. *Shurrum v. Watts*, 80 Idaho 44, 53, 324 P.2d 380, 385 (1958). A resulting trust arises "only where such may reasonably be presumed to be the intention of the parties as determined from the facts and circumstances existing at the time of the transaction." *Id.* This Court has held that, generally, resulting trusts arise in one of two ways:

> (1) where title to property is transferred to one party, the trustee, although another party, the beneficiary of the trust, paid the purchase price for that property; or (2) where legal title to property is transferred by gift or devise, with an apparent intent that the donee or devisee is to hold legal title as a trustee in order for the beneficiary of the trust to enjoy the beneficial interest in that property.

*Hettinga v. Sybrandy*, 126 Idaho 467, 470, 886 P.2d 772, 775 (1994). Therefore, in order to establish the existence of a resulting trust, the Partnership must prove that both the Partnership and the Gentillons intended for the Gentillons to hold title to the 50-foot strip in trust for the Partnership, and that the Partnership either paid or incurred an absolute obligation to pay for that property. *See id.*

8

In its Amended Findings of Fact, the district court determined that the Partnership failed to establish a resulting trust by clear and convincing evidence to any part of lot T-10032 other than the corner where the center pivot was located or to any part of the BLM Lot. Whether a party presented sufficient evidence to meet the clear and convincing standard is a finding of fact that this Court will uphold if substantial and competent evidence supports it. *Id.* The district court acknowledged that the 1998 Agreement contemplated land being transferred to the Partnership to equalize farmable acreage with that in Lot 16 if necessary, but did not find that the Partnership had proven that such an exchange was necessary or ever took place. The court also found that Scott Gentillon deeded all of the BLM Lot to the Gentillons and that they in turn deeded it unmodified to the Petersons. The court noted that for several years prior to and after the transfer to the Gentillons, the Partnership openly tilled a portion of this lot, "but nothing demonstrates any intention on the part of the Gentillons to reserve any of that land for the use of the Partnership after the sale to the Petersons."

The Partnership argues that after the January 1999 survey indicated that the garden spot was titled to the Partnership, it orally agreed with the Gentillons to exchange the garden spot for the 50-foot strip. The Gentillons dispute on appeal that this oral exchange took place, but admitted to it in their Closing Brief for Supplemental Trial (Gentillons' Closing Brief). In their Closing Brief, the Gentillons state in relevant part that:

> In January 1999, Darren Leavitt surveyed the property. While performing that survey Darren Leavitt discovered that the property line bisected the home. Darren Leavitt informed both the Gentillons and the Partnership of the issue. The Gentillons and the Partnership agreed to exchange property under the home and garden for property on the south side of T-10032. Darren Leavitt drafted a survey to that effect and the parties agreed to the property lines set out in the survey.

This strongly supports the Partnership's claim that the Gentillons intended to transfer the 50-foot strip to the Partnership and that the Partnership incurred an absolute obligation to pay for that property with the garden spot. Although conflicting evidence may still be substantial and competent evidence, in light of the Gentillons' own admissions, this Court finds that substantial and competent evidence does not support the district court's finding that the Gentillons did not intend to transfer the 50-foot strip to the Partnership.

9

**C. The District Court Erred by Defining the Width of the Petersons' Road Access Easement as 30 Feet.**

The Partnership does not dispute that the Petersons have a road access easement across the northern boundary of Lot 1, only that the court erred in enlarging the easement to 30 feet in width or past the bounds of the private road. The Partnership contends that the district court erred in defining the scope of this easement when its existence was never an issue at trial. The Petersons counter that the district court correctly interpreted the ambiguous language of the deed reserving the easement by looking at Marcel Gentillon's intent when he reserved the easement. The Petersons argue that the district court's decision to define the scope and dimensions of the easement are not only appropriate, but also mandatory.

The first issue is whether the district court erred in defining this easement in its judgment. This Court has held "that any judgment determining the existence of the easement must also specify its width." *Argosy Trust ex rel. Its Tr. v. Wininger*, 141 Idaho 570, 572, 114 P.3d 128, 130 (2005). Indeed, the Court noted in *Argosy Trust* that just "[b]y bringing this action seeking a judgment establishing the easement, the Argosy Trust also placed at issue the width of the easement." *Id.* Similarly, in *Kosanke v. Kopp,* 74 Idaho 302, 261 P.2d 815 (1953), this Court remanded a case establishing a road easement because of the insufficiency of the trial court's description of the easement in its judgment. When doing so, this Court stated:

> A judgment which affects the title or interest in real property must describe the lands specifically and with such certainty that the court's mandate in connection therewith may be executed, and such that rights and liabilities are clearly fixed and that all parties affected thereby may readily understand and comply with the requirements thereof.

*Id.* at 307, 161 P.2d 818.

This case differs from *Argosy Trust* and *Kosanke* because the parties did not dispute the existence or scope of the easement over the northern boundary of Lot 1 in their quiet title claims. Indeed, the actual width of the road over which the easement passes does not appear to even be in the record. However, the Petersons' quiet title action does affect the title of real property, which included the easement over the northern boundary of Lot 1. Therefore, the district court did not abuse its discretion by defining the easement with more specificity in its judgment.

Since it was within the district court's discretion to define this easement, the second issue is whether it erred by defining the width of the easement as 30 feet. "The width of an easement is a question of fact which will not be disturbed on appeal if it is supported by substantial and

10

competent evidence." *Turner v. Cold Springs Canyon Ltd. P'ship*, 143 Idaho 227, 229, 141 P.3d 1096, 1098 (2006).

The Gentillons created the road access easement across the northern boundary of Lot 1 when they transferred Lot 1 to Scott Gentillon in 1991 and specifically excepted T-10032 and a "road access and easement over an existing private road to the country road." Thus, the Gentillons created an express easement by exception limited to the width of the private road. *See Akers v. D.L. White Construction, Inc.*, 142 Idaho 293, 301, 127 P.3d 196, 204 (2005) ("[A]n express easement by exception operates by withholding title to a portion of the conveyed property.").

The evidence supporting the district court's determination that the Petersons' access easement is 30 feet wide consists of the Petersons correction deed and the two surveys of the disputed property. This evidence, taken together, does not support the district court's finding of a 30-foot easement. First, the correction deed did not create the easement; therefore, it could not unilaterally enlarge the easement's scope. Moreover, Craig Peterson testified that he determined the dimensions for the access easement by looking at the language in the Partnership's warranty deed from Scott Gentillon. However, the language that Craig Peterson relied upon for the access easement's dimensions actually referred to "an ingress and egress easement" that the warranty deed conveyed to the Partnership, not the Gentillons' easement over the Partnership's land. Second, the two surveys only give the dimensions for the access easement, but do not indicate that these are the dimensions for the private road. On the first survey, which was commissioned by Scott Gentillon in 1999, the easement is marked as "30' Ingress-Egress Easement." Robert Butler completed the second survey in 2010 in connection with this litigation, and also marked the access easement's width as 30 feet. When the Petersons sought to enter Butler's diagram into evidence the Partnership objected to the 30-foot designation. However, no evidence was submitted as to the private road's actual width at the time of the easement's creation.

Because there is no evidence in the record as to the width of the private road when the easement was created in 1991, we remand for further proceedings consistent with this opinion.

**D. The District Court Erred by Requiring the Partnership to Maintain the Easement for the Center Pivot's Passage and Prevent the Pivot from Casting Water on the Petersons' Access Road.**

The Partnership argues that the district court erred in limiting the Partnership's use of its property subject to the Petersons' road access easement. Specifically, it contends that the district court enlarged the burden on the Partnership's servient estate by restricting periodic spraying of irrigation water on the road. The Petersons respond that the district court's decision to define the scope of the easement for the passage of the center pivot is supported by facts, but do not address the court's restriction on the Partnership spraying water on its road subject to the Petersons' easement. Rather, the easement the Petersons refer to in their brief is the Partnership's access easement over the northern 30 feet of the Petersons' property running east to the highway. The Partnership's access easement is not at issue. The only issue is whether the district court erred by restricting the Partnership from spraying water on its private road subject to the Petersons' access easement. In its Amended Final Judgment, the district court defines the scope of the Partnership's easement for the center pivot as follows:

> [T]he named Gentillons shall be responsible at their sole cost to maintain the easement and shall prevent their center pivot from casting water upon the Petersons' improvements and upon the Petersons' access road. Furthermore, the easement for passage of the center pivot is limited solely to movement of the center pivot and does not include farming any portion of the easement.

The Partnership's center pivot cast water on the Petersons' access road from May 2011 until July 19, 2011, when the Partnership modified the operation of the end gun to prevent it from casting water as the pivot arced along the Petersons' access road. The Petersons brought a contempt action against the Partnership for spraying water on the access road and improvements. The district court found that the spraying of water on the access road did not materially impede the Petersons' use of the road, but required the Partnership to continue to comply with the court's judgment and prevent the center pivot from casting water on the access road.

This Court has summarized the corresponding rights of dominant and servient owners of easements as follows:

> The owner of the servient estate is entitled to use the estate in any manner not inconsistent with, or which does not materially interfere with, the use of the easement by the owner of the dominant estate. In other words, the servient estate owner is entitled to make uses of the property that do not unreasonably interfere with the dominant estate owner's enjoyment of the easement.

12

*Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 522, 20 P.3d 702, 706 (2001) (citations omitted). Thus, the Partnership is entitled to use its road in any manner that does not materially interfere with the Petersons' use of the road for access to their property. Because the district court found that the Partnership's periodic spraying of water on the road did not materially impede the Petersons' use of the road, the court erred in prohibiting the Partnership from intermittent spraying of the road.

### E. No Party Is Entitled to Attorney Fees on Appeal.

The Gentillons argue that they are entitled to attorney fees on appeal under both I.C. § 12-120(3) and the attorney fee provision of the 1998 Agreement. The Partnership argues in their Reply that they are entitled to attorney fees under the terms of the 1998 Agreement if the district court is reversed and the resulting trust theory is applied to all of the disputed ground as described in the Leavitt survey. The Petersons do not request attorney fees on appeal.

The Partnership succeeded on all of the issues against the Gentillons in this appeal. However, because the Partnership failed to ask for attorney fees in its first appellate brief no attorney fees are awarded on appeal.

### V. CONCLUSION

We reverse the district court's dismissal of the Partnership's claim for specific performance of the 1998 Agreement and the district court's denial of the Partnership's resulting trust claim as to the 50-foot strip. We also reverse its decision defining the width of the Petersons' easement as 30-feet and restricting the Partnership from spraying water on its private road subject to the Petersons' easement. The costs awarded below are vacated. No attorney fees are awarded on appeal. Costs to the Partnership.

Justices EISMANN, J. JONES, W. JONES and HORTON, **CONCUR.**

13