T.C. Memo. 2014-25

UNITED STATES TAX COURT

CHRISTOPHER CARL CLOSE AND LISA MARIE CLOSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20645-07.                          Filed February 10, 2014.

Christopher Carl Close and Lisa Marie Close, pro sese.

Catherine L. Campbell and Danae M. Rawson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies in Christopher Carl

Close and Lisa Marie Close's Federal income tax and additions to tax under

sections 6651(a)(1) and (2) and 6654[1] as follows:

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2]

### Additions to tax

| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
|------|-----------|-----------------|-----------------|-----------|
| | | Mr. Close | | |
| 2003 | $68,843 | $15,490 | TBD | $1,802 |
| 2004 | 17,358 | 3,906 | TBD | 504 |
| | | Mrs. Close[1] | | |
| 2003 | $52,800 | $11,880 | TBD | $1,382 |
| 2004 | 17,358 | 3,906 | TBD | 504 |

[1]Respondent attributed some of the income Mr. Close purportedly earned during these years to Mrs. Close because Idaho, where petitioners then resided, is a community property State.

---

[1](...continued)
Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts have been rounded to the nearest dollar.

[*3]    After concessions,[2] the issues for decision are:  (1) whether Mr. Close had unreported income of $323,246 from logging activities on a 750-acre parcel of real property with an address on Winch Avenue, Rathdrum, Idaho (Winch Road property), in 2003; (2) whether Mr. Close had unreported income of $48,262 from logging activities on a 120-acre parcel of real property with an address on Nelson Loop Road, Rathdrum, Idaho (Nelson Loop Road property), in 2003; and (3) whether petitioners are liable for additions to tax under sections 6651(a)(1) and (2) and 6654 for 2003.

## FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulations of facts are incorporated herein by this reference.  When they petitioned this Court, Mr. Close was incarcerated in a Federal prison camp in California and Mrs. Close resided in Idaho.

---

[2]Petitioners concede that (1) Mr. Close received unemployment compensation of $6,026 in 2003; (2) Mrs. Close received taxable income of $3,721 from J.D. Lumber in 2003; (3) Mrs. Close received wages of $201 from Columbia Lighting, Inc., in 2003; (4) Mrs. Close received wages of $599 and $4,366 from O'Malley's Sports Pub Grill in 2003 and 2004, respectively.

Respondent concedes that petitioners (1) had no taxable gain from the sale of real property in Hayden Lake, Idaho, in 2004; and (2) are not liable for additions to tax under secs. 6651(a)(1) and (2) and 6654 for 2004.

**[*4]** I.    <u>Background</u>

Petitioners married in 1990. They have four children. In 1995 Mr. Close started a medical equipment business. On a date that is unclear from the record he sold the medical equipment business.

In 2001 the Federal Government (Government) executed multiple search warrants with respect to Mr. Close's medical equipment business and the entity that purchased it. One of those warrants was executed in November 2001.

On March 12, 2003, the Government filed an indictment, and on August 14, 2003, a superseding indictment, against Mr. Close in the U.S. District Court for the District of Idaho. On July 27, 2004, a jury found Mr. Close guilty of 30 counts of healthcare fraud, 9 counts of money laundering, 1 count of obstructing a Federal audit, and 1 count of obstructing a Federal healthcare fraud investigation. Mr. Close was incarcerated on March 30, 2005. On February 1, 2011, he was released to a halfway house, and on July 30, 2011, he was released from custody. The last Federal income tax return that petitioners filed before Mr. Close's incarceration was their 2001 return.

[*5] II.    Winch Road Property

A.    Option To Purchase the Winch Road Property

In January 2003 Mr. Close and Mike Leach proposed purchasing the Winch Road property from Jerry and Edna Tefft and drafted an option to purchase the Winch Road property dated January 20, 2003 (original Winch Road option). Mr. Close, Mr. Leach, and Mr. and Mrs. Tefft signed the original Winch Road option. Under the original Winch Road option, the Teffts agreed to grant Mr. Close and Mr. Leach an option to purchase the Winch Road property for $1.4 million, and Mr. Close and Mr. Leach agreed to pay the Teffts $1,000 as consideration for the option. The original Winch Road option further provided that Mr. Close and Mr. Leach would pay 70% of the proceeds of any timber sales to Mr. and Mrs. Tefft until Mr. Close and Mr. Leach paid off the balance owed on the property. The original Winch Road option was recorded on January 30, 2003.

Also on January 30, 2003, Mr. Close, Mr. Leach, and Mr. and Mrs. Tefft recorded an amended Winch Road option. Under the amended Winch Road option, Mr. Close and Mr. Leach gave notice that they would exercise their option to purchase the Winch Road property and agreed to execute a promissory note of $1.4 million for the purchase of the property. Of that amount, $700,000 was to be due by August 1, 2003, and the remainder was to be due by May 1, 2004. Mr.

[*6] Close and Mr. Leach agreed that 70% of the proceeds of any timber sales would go toward satisfying the balance due on the promissory note. The amended Winch Road option granted Mr. Close and Mr. Leach the right to immediately commence logging operations on the Winch Road property.

    B.    <u>Hidden Valley Ranch, LLC</u>

In February 2003 Mr. Close and Mr. Leach formed Hidden Valley Ranch, LLC, for the purpose of managing the logging, farming, and other operations on the Winch Road property. Hidden Valley Ranch, LLC, managed logging and other activities on the Winch Road property throughout 2003 and 2004. It also maintained a checking account, and on November 24, 2004, it filed a Form 1065, U.S. Return of Partnership Income (partnership return), for 2003. Clark, Anderson, McNelis & Co. (Clark Anderson), a public accounting firm, prepared, and Mr. Leach signed, Hidden Valley Ranch, LLC's 2003 partnership return.

On a date that is unclear from the record and for reasons that are unclear from the record Mr. Leach's wife, Donna Leach, who is an accountant but not a certified public accountant (C.P.A.), began to summarize the income and expenses of the logging activities on the Winch Road property. Because she was unable to access the databases on Hidden Valley Ranch, LLC's computer, she had to reconstruct Hidden Valley Ranch, LLC's records for 2003 and 2004. She

**[\*7]** prepared balance sheets and profit and loss statements for Hidden Valley

Ranch, LLC, and gave these to Lynn Anderson, a C.P.A. at Clark Anderson, to

prepare an amended 2003 partnership return for Hidden Valley Ranch, LLC.

    C.    <u>Lost Creek Trust</u>

On February 28, 2003, petitioners, Mr. Leach, and John A. Dixon purported

to form Lost Creek Irrevocable Trust (Lost Creek Trust) by signing a trust

agreement. Petitioners and Mr. Leach signed the trust agreement as the grantors,

and Mr. Dixon signed the trust agreement as the trustee. Under the Lost Creek

Trust agreement, the grantors purported to convey their interest in the Winch Road

property to the trustee. Thereafter, on a date that is not in the record Mr. and Mrs.

Tefft conveyed the Winch Road property to Mr. Dixon as trustee of Lost Creek

Trust.[3]

Petitioners' four children, Mr. Leach's two children, and Mrs. Leach's two

children are the beneficiaries of Lost Creek Trust. The Lost Creek Trust

agreement requires the trustee to pay for the benefit of each beneficiary such sums

from principal and interest as the trustee deems reasonable "for the maintenance,

---

[3]We infer from the terms of the option agreements, from the conveyance of title by Mr. and Mrs. Tefft, and from the income respondent is claiming was generated from timber sales that the purchase price of the Winch Road property was paid in whole or in part out of the proceeds from timbering activities on that property.

[*8] education, support and health of the beneficiaries".  The agreement also provided that Carrie Loomis, Mr. Close's sister, and Kelly Scott, Mr. Leach's sister, would serve as successor cotrustees to Mr. Dixon if he would no longer be able or willing to serve.  However, on or about December 4, 2004, when Mr. Dixon resigned as trustee, Ms. Scott became the sole successor trustee.

### D.     Lost Creek Partnership

On January 24, 2005, the District Court in Mr. Close's criminal case issued a postconviction preforfeiture restraining order.  The restraining order prohibited, among other things, any harvesting of timber on the Winch Road property.

On March 2, 2005, the District Court issued a preliminary order of forfeiture, preliminarily forfeiting Mr. Close's interest in, among other things, the Winch Road property.  On March 29, 2005, Ms. Scott filed a petition to adjudicate the third-party interest of Lost Creek Trust in the Winch Road property.

On February 23, 2006, the Government filed a motion for the District Court to issue an order to show cause with respect to certain alleged violations by Mr. Leach of the January 24, 2005, postconviction preforfeiture restraining order.  On February 24, 2006, the District Court issued the requested order to show cause.

On a date that is unclear from the record, Mr. and Mrs. Leach met with Revenue Agent Nicoli Ferrell, Assistant U.S. Attorney Anthony Hall, a Federal

**[*9]** marshal, and Mike Anderson, an attorney, at the courthouse in Coeur d'Alene. At the meeting Mr. and Mrs. Leach were told to disregard Lost Creek Trust and Hidden Valley Ranch, LLC, and to instead file partnership returns for what would be known as Lost Creek Partnership. Mr. and Mrs. Leach were also told that the Internal Revenue Service (IRS) would file the partnership returns for them--without including any expenses--if they failed to file the partnership returns themselves.

On April 6, 2006, Revenue Agent Ferrell sent a letter to Mr. Leach informing him that the IRS had determined that Lost Creek Trust is not a valid trust, that Mr. Leach should file amended returns for Hidden Valley Ranch, LLC, reporting zero income, and that Mr. Leach should instead report all income and expenses from timber operations on the Winch Road property on partnership returns for Lost Creek Partnership. Additionally, the letter stated as follows:

> As previously discussed, in addition to being required by the circumstances and the law applicable in this case, the partnership filing is likely to be the most economically advantageous position for you and should allow the United States Attorney's office to go forward in its criminal-forfeiture-ancillary-proceeding claims against the defendant, * * * [Mr.] Close, and that portion of the property/partnership subject to the Preliminary Order of Forfeiture, without involving you in lengthy litigation in that proceeding.

**[\*10]** On April 10, 2006, the Government filed a notice of status of show-cause proceeding, informing the District Court that it was satisfied that all timber harvested on the Winch Road property had been properly accounted for.[4] Also on April 10, 2006, Revenue Agent Ferrell sent a letter to Mr. Close informing him that the IRS had determined that Lost Creek Trust is not a valid trust and that he should instead file partnership returns for Lost Creek Partnership.

On a date that is unclear from the record Assistant U.S. Attorney Hall provided to Mrs. Leach a summary of income earned from timber operations on the Winch Road property in 2003. The summary was originally prepared by the Department of Health and Human Services (HHS), apparently in connection with Mr. Close's criminal case.[5]

Laima Swanson, who was then a C.P.A. at Clark Anderson, used a balance sheet and a profit and loss statement that Mrs. Leach had prepared for Hidden Valley Ranch, LLC, to prepare various documents and schedules, and ultimately, to prepare 2003 and 2004 partnership returns for Lost Creek Partnership. The

---

[4]The Government's notice erroneously refers to the Nelson Loop Road property instead of the Winch Road property.

[5]This is Exhibit 25-R. See infra note 12. The copy of the summary that is in the record is dated September 8, 2006. It reflects receipts of $2,435,983 for timber operations in 2003. It is unclear whether Mrs. Leach used this summary in preparing the 2003 profit and loss statement for Hidden Valley Ranch, LLC.

[*11] balance sheet and the profit and loss statement are dated April 27, 2006. The profit and loss statement and a related timber schedule reflect receipts of $2,045,562 for timber operations in 2003. On May 4, 2006, Mr. Leach signed and filed Lost Creek Partnership's partnership returns for 2003[6] and 2004. Lance Woodall, who was then a manager at Clark Anderson, signed Lost Creek Partnership's 2003 and 2004 partnership returns as the preparer because Ms. Anderson was unavailable to review the return at the time and Clark Anderson was under pressure from the IRS to file the partnership returns promptly.

The 2003 Lost Creek Partnership return reported total assets, total income, and ordinary income of $913,403, $747,146, and $747,146, respectively. The return also reported on attached Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., that Mr. Leach and Mr. Close each had distributive shares of ordinary income, section 179 expense, and other deductions of $373,573, $50,000, and $327, respectively, for 2003.[7]

---

[6]Form 4797, Sales of Business Property, of the 2003 partnership return reported timber sales of $2,045,562, cost or other basis of $1,229,091, and ordinary gain of $816,471, which was included in calculating the partnership's total and ordinary income of $747,146.

[7]Mr. and Mrs. Leach have since entered into a collection agreement with respondent, and as of the date of trial they were still paying off their purported 2003 tax liability.

[*12] On July 12, 2007, the U.S. Attorney's Office and Mr. and Mrs. Leach filed a stipulation in the District Court with respect to the custody and management of the Winch Road property. The stipulation states, in relevant part, as follows:

> 7. The Leaches concede that the Lost Creek Irrevocable Trust is inoperative to insulate it from the Government's claim of forfeiture against * * * [Mr.] Close's interest in the Winch Road [p]roperty. The property was in fact operated as a partnership between the Leaches and * * * [Mr.] Close. To that end the Leaches have cooperated with the Government by preparing [F]ederal income tax returns for the operations relating to the ranch characterizing the operation as a partnership between the Leaches and * * * [Mr.] Close. The Leaches have further cooperated with the Government by accounting for activities on the Winch Road [p]roperty, including timber harvesting, which has the potential for affecting the value of the Winch Road [p]roperty. The Leaches agree to appear and testify truthfully in all proceedings related to the pending criminal ancillary matter herein, and to produce such documents and records as may be required to conclude these proceedings.

> \* \* \* \* \* \* \*

> 9. The Government and the Leaches desire to market and sell the Winch Road [p]roperty for the purpose of resolving the Government's forfeiture claim against the interest of * * * [Mr.] Close in the Winch Road [p]roperty, and for the purpose of effecting a termination and winding up of the partnership between * * * [Mr.] Close and the Leaches in the Winch Road [p]roperty.

> \* \* \* \* \* \* \*

> 16. The Government and the Leaches agree that the Leaches shall manage, operate, and maintain the Winch Road [p]roperty in an efficient, reasonable, and satisfactory manner, subject to this Stipulation. The relationship between the Leaches and the

[*13] Government will be one of trust in which the Leaches will comply with all of the obligations of a fiduciary.  * * *

\* \* \* \* \* \* \*

19.  The Leaches will take all action necessary to reasonably and efficiently operate the Winch Road [p]roperty.  * * *

\* \* \* \* \* \* \*

22.  In consideration of Leaches' services as provided in this Stipulation, the Leaches will be entitled to retain the proceeds from the use of the Winch Road [p]roperty, to wit:  the haying operation. * * *

23.  The Government acknowledges that the Leaches intend to board their personal livestock on the Winch Road [p]roperty and agrees that the Leaches may do so * * *.

The Leaches have since operated a ranch on the Winch Road property, and they have earned $15,000 per annum from haying operations on the property. Additionally, Mr. Leach has sold off or used up many of the assets that were originally reported on Hidden Valley Ranch, LLC's 2003 partnership return.

On July 31, 2007, Mr. and Mrs. Leach filed a petition to adjudicate their joint third-party interest in the Winch Road property.  As of the date of trial in this case, no hearings had been held and no motions had been filed with respect to either (1) Ms. Scott's petition to adjudicate the interest of Lost Creek Trust in the

[*14] Winch Road property or (2) Mr. and Mrs. Leach's petition to adjudicate their joint interest in the Winch Road property.

III.    Nelson Loop Road Property

A.    Original Hidden Valley Trust Agreement

On September 23, 1998, Mr. Close and Norman Gissel formed Hidden Valley Trust by signing a trust agreement (original Hidden Valley Trust agreement).  Mr. Close signed the original Hidden Valley Trust agreement as the grantor, and Mr. Gissel signed the original Hidden Valley Trust agreement as the trustee.  Pursuant to the original Hidden Valley Trust agreement, Mr. Close transferred $12,500 to the trust.  Under the original Hidden Valley Trust agreement, the trust could be revoked, altered, amended, modified, or terminated at the will of Mr. Close, and he was the sole beneficiary of the trust.

B.    Purchase of the Nelson Loop Road Property

On a date that is unclear from the record Mr. Gissel, as trustee of Hidden Valley Trust, used the $12,500 that Mr. Close had transferred to the trust as part of the consideration for the purchase of the Nelson Loop Road property.  Petitioners personally guaranteed the mortgage on the Nelson Loop Road property.  On September 30, 1998, Mr. Gissel resigned as the trustee.

[*15] Petitioners operated an unincorporated ranch called Triple C Ranch on the Nelson Loop Road property. At some time in 2001 petitioners and their four children moved to the Nelson Loop Road property.

C.     Amended Hidden Valley Trust Agreement

On December 13, 2001, petitioners and Ms. Loomis[8] amended the original Hidden Valley Trust agreement by signing an amended trust agreement (amended Hidden Valley Trust agreement). The amended Hidden Valley Trust agreement was prepared by an attorney. Petitioners signed the amended Hidden Valley Trust agreement as the grantors, and Ms. Loomis signed it as the trustee. The amended Hidden Valley Trust agreement purports to amend, in its entirety, the original Hidden Valley Trust agreement.

The amended Hidden Valley Trust agreement created two trust shares: (1) Hidden Valley Trust Revocable Share (revocable share), and (2) Hidden Valley Trust Irrevocable Share (irrevocable share). Petitioners were the beneficiaries of the revocable share, and petitioners' four children were the beneficiaries of the irrevocable share. The amended Hidden Valley Trust agreement provided that the revocable share of the trust continued to hold the Nelson Loop Road property, and

---

[8]We infer from the amended Hidden Valley Trust agreement that Ms. Loomis became the trustee of Hidden Valley Trust sometime after Mr. Gissel resigned.

**[*16]** the grantors transferred $1 to the irrevocable share of the trust. The amended Hidden Valley Trust agreement further provided that the grantors could transfer a portion of their interest in the revocable share to the irrevocable share, and that after a short period in which the beneficiaries of the irrevocable share would be permitted to demand a distribution of the transferred assets, the transferred portion of the revocable share would become an asset of the irrevocable share.

Also on that date petitioners assigned a one-half interest in the revocable share to the irrevocable share. On December 14, 2001, Hidden Valley Trust filed a trust registration with Kootenai County. On February 4, 2002, petitioners assigned their remaining one-half interest in the revocable share to the irrevocable share. The irrevocable share was thereafter known as Hidden Valley Trust and was to be administered by the trustee for the benefit of petitioners' children. Specifically, the amended Hidden Valley Trust agreement requires the trustee to pay for the benefit of each beneficiary such sums from principal and interest as the trustee deems reasonable "for the maintenance, education, support and health of each such beneficiary." The trustee was specifically instructed not to use trust assets to relieve petitioners of "any statutory obligation" with respect to minor beneficiaries.

**[*17]** D.     Logging Activities

In November 2002, after learning that the price of timber had recently increased, Mr. Close suggested to Ms. Loomis that Hidden Valley Trust should harvest timber off the Nelson Loop Road property.  Logging activities on the Nelson Loop Road property began in 2003.  Some of the timber proceeds were used to pay down the mortgage on the Nelson Loop Road property and some of the proceeds were used to improve the property.  Hidden Valley Trust filed a Federal income tax return for 2003.

E.     Forfeiture Proceedings

On March 2, 2005, the District Court in Mr. Close's criminal case issued an order preliminarily forfeiting Mr. Close's interest in the Nelson Loop Road property.  In doing so the District Court determined that the Nelson Loop Road property had the requisite nexus with Mr. Close's criminal activity so as to be subject to forfeiture.

On March 31, 2005, Ms. Loomis, as trustee of Hidden Valley Trust, filed a petition to adjudicate the trust's interest in the Nelson Loop Road property.  On April 23, 2007, the District Court dismissed Ms. Loomis' petition on the basis of the following uncontested facts:  (1) the criminal acts that Mr. Close committed began in January 1998; (2) Hidden Valley Trust was formed on September 23,

[*18] 1998; (3) the trust was twice modified, the trustee was changed, and transfers of property were made to Hidden Valley Trust; and (4) the petition did not allege facts that demonstrated that Hidden Valley Trust was a bona fide purchaser for value of the right, title, or interest in the Nelson Loop Road property. Accordingly, the District Court concluded that Hidden Valley Trust failed to allege a prima facie case and dismissed the petition.[9] On July 17, 2012, the District Court entered a final order of forfeiture with respect to the Nelson Loop Road property.

IV. Notices of Deficiency

On July 30, 2007, respondent issued to petitioners separate notices of deficiency. On the Form 4549-A, Income Tax Discrepancy Adjustments, attached to the notice of deficiency that respondent issued to Mr. Close, respondent indicated that he adjusted Mr. Close's income to reflect, among other items, (1) income of $323,246 and loss of $13,569 for 2003 and 2004, respectively, reported on Schedule E, Supplemental Income and Loss (partnership income adjustments);

---

[9]To allege a prima facie case Hidden Valley Trust was required to show that it either "(1) had a vested or superior right, title, or interest in the property when * * * [Mr. Close] committed the acts giving rise to the forfeiture, or (2) is a bona fide purchaser for value of the right, title, or interest in the property and at the time of the purchase was reasonably without cause to believe the property was subject to forfeiture". United States v. Lazarenko, 476 F.3d 642, 648 (9th Cir. 2007).

[*19] and (2) other income of $51,983 for 2003 (other income adjustment).  On an

attached Form 886-A, Explanation of Items, respondent explained the partnership

income adjustments and the other income adjustment as follows:

Schedule E--Income/Loss--Partnerships/S-Corporations--
Passive/Non-Passive

| Tax period | Per return | Per exam | Adjustment |
|---|---|---|---|
| 2003 | -0- | $323,246 | $323,246 |
| 2004 | -0- | (13,569) | (13,569) |

It is determined that the taxpayer received gross income or net
loss from the flow-through of ordinary income/loss from the
partnership, Hidden Valley Ranch LLC, for the tax years as shown
above.  We determined the amounts from Schedules K-1 filed with
the partnership returns.  It is further determined that the non-passive
income is self employment income subject to the self employment
tax.

Other Income

| Tax period | Per return | Per exam | Adjustment |
|---|---|---|---|
| 2003 | -0- | $51,983 | $51,983 |

It is determined that the taxpayer received gross income from a
grantor trust, Hidden Valley Irrevocable Trust and from sales
associated with J.D. Lumber.  The amounts are as follows.

| | |
|---|---|
| Hidden Valley Irrevocable Trust | $48,262 |
| J.D. Lumber | 3,721 |
| Total | 51,983 |

[*20]                           OPINION

Respondent contends that (1) Mr. Close had income of $323,246 from logging activities by Lost Creek Partnership[10] on the Winch Road property in 2003 because Lost Creek Trust is a sham;[11] and (2) Mr. Close had income of $48,262 from logging activities on the Nelson Loop Road property in 2003 because Hidden Valley Trust is either a grantor trust or a sham.

---

[10]The unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, do not apply to the purported Lost Creek Partnership because it qualifies as a small partnership under sec. 6231(a)(1)(B)(i) and did not elect, pursuant to sec. 6231(a)(1)(B)(ii), to have TEFRA apply. See New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 173 n.3 (2009), aff'd, 408 Fed. Appx. 908 (6th Cir. 2010).

[11]Respondent asserts for the first time on brief that Lost Creek Trust is invalid under State law because petitioners and Mr. Leach, the purported grantors of Lost Creek Trust, had not yet acquired title to the Winch Road property when they purported to convey it to the trustee, Mr. Dixon, on February 28, 2003. In short, respondent contends that Lost Creek Trust is invalid because it lacked a corpus.

As a general rule, we will not consider issues first asserted on brief. See Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 346-349 (1991). This is particularly so in this case because petitioners had no opportunity to address respondent's contention or to demonstrate the trust's validity under Idaho law. See, e.g., Peterson v. Gentillon, 296 P.3d 390, 396 (Idaho 2013) (discussing resulting trusts under Idaho law).

**[*21]** I.     Preliminary Matters

    A.     Summary Documents

On September 4, 2012, respondent filed a request for admissions. Petitioners' response to respondent's request for admissions was due within 30 days. See Rule 90(c). On October 24, 2012, petitioners submitted their response to respondent's request for admissions. However, pursuant to Rule 90(c), respondent's requested admissions had already been deemed admitted. On October 25, 2012, we withdrew petitioners' deemed admissions. See Rule 90(f). Trial was held in this case on November 29, 2012.

At trial respondent introduced several exhibits that are purportedly derived from documents and records that respondent did not share with petitioners before trial. These exhibits include all of the evidence supporting respondent's computations of the income received by the purported Lost Creek Partnership from the logging activities on the Winch Road property and some of the evidence supporting respondent's computations of the income received by Hidden Valley Trust from the logging activities on the Nelson Loop Road property. We admitted these exhibits solely for the purpose of showing how the revenue agent determined petitioners' deficiencies. On brief respondent contends that we should admit these

[*22] exhibits as summaries of voluminous evidence pursuant to rule 1006 of the Federal Rules of Evidence. We decline to do so.

The contents of voluminous writings that cannot conveniently be examined in court may be presented in summary form only if the writings are made available for examination or copying, or both, by other parties at a reasonable time and place. See Fed. R. Evid. 1006. Respondent admits that the underlying documents were not made available to petitioners before trial; respondent contends that this was because we relieved petitioners of their deemed admissions shortly before trial. We reject respondent's suggestion that there was insufficient time to make the underlying documents available to petitioners. We relieved petitioners from their deemed admissions more than a month before trial, and respondent had more than sufficient time to make the documents available to petitioners. Because respondent failed to make the underlying documents available to petitioners before trial, we reject respondent's attempt to rely on these exhibits to prove the truth of the matters asserted therein.[12]

---

[12]Additionally, Exhibit 25-R, which is a document that purports to summarize income earned from logging activity on the Winch Road property in 2003, and Exhibit 36-R, which is a document that purports to summarize income earned from logging activity on the Nelson Loop Road property in 2003, are largely unsupported by any evidence. Revenue Agent Erin Lewis testified that both of these documents were prepared by HHS in connection with Mr. Close's

(continued...)

**[\*23]** B.     <u>Judicial Notice</u>

On November 21, 2012, respondent filed with the Court a motion requesting

judicial notice of certain facts established by several documents that were filed in

Mr. Close's criminal case.  We granted respondent's motion; we now explain.

Generally, under rule 201(b) of the Federal Rules of Evidence, an

adjudicative fact can be judicially noticed only if it is (1) generally known within

the trial court's territorial jurisdiction or (2) capable of accurate and ready

determination by sources whose accuracy cannot reasonably be questioned.  <u>See</u>

<u>Estate of Reis v. Commissioner</u>, 87 T.C. 1016, 1026 (1986).  We may take judicial

notice on our own, and we must take judicial notice if a party requests it and

supplies the Court with the necessary information.  <u>See</u> Fed. R. Evid. 201(c).  We

may take judicial notice at any stage of the proceeding.  <u>See</u> <u>id.</u> subdiv. (d).

As respondent recognizes on brief, we may not take judicial notice of the

specific findings of fact in another case because "[s]uch findings do not satisfy the

two tests of [r]ule 201(b).  They are not generally known to the public, nor are

---

[12](...continued)
criminal case.  Revenue Agent Lewis did not testify regarding how and from what
these documents were prepared, and respondent did not call any HHS
representative to testify concerning the preparation of these documents.  As
presented, these exhibits lack a foundation and are inadmissible to prove the truth
of the matters asserted therein.  <u>See</u> Fed. R. Evid. 901.

**[*24]** they so indisputable that their accuracy cannot reasonably be questioned." Estate of Reis v. Commissioner, 87 T.C. at 1028. However, we may take judicial notice of the text of judicial opinions and orders and of court filings to determine what issues the other court decided. See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); Estate of Reis v. Commissioner, 87 T.C. at 1027. If we determine that issues of fact or law were litigated in the prior proceeding that are identical to issues of fact or law being litigated in the current proceeding, we "may apply the principle of collateral estoppel or res judicata to bar further litigation of the same issues in the present proceeding." Estate of Reis v. Commissioner, 87 T.C. at 1027.

## II. Burden of Proof

### A. Burden of Proof Generally

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if the Commissioner raises a new matter, seeks an increase in a deficiency, or asserts an affirmative defense, the Commissioner has the burden of proof as to the new matter or increased deficiency. Rule 142(a)(1).

**[*25]** A new theory that merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter. See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989) (citing Achiro v. Commissioner, 77 T.C. 881, 890 (1981), Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974), and McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968)). But a new theory that either alters the original deficiency or requires the presentation of different evidence is a new matter. See id. (citing Colonnade Condo., Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988), and Achiro v. Commissioner, 77 T.C. at 890-891).

Under section 7522, a notice of deficiency must "describe the basis for" any tax deficiency included in the notice. Consequently, we have held that

> where a notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were described in the notice of deficiency, the Commissioner * * * bear[s] the burden of proof regarding the new basis. * * *

Shea v. Commissioner, 112 T.C. 183, 197 (1999).

B.    Presumption of Correctness in Unreported Income Cases

The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case appears to lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2),

**[\*26]** has held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must establish some evidentiary foundation connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977), or demonstrating that the taxpayer actually received unreported income, see Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982).[13] If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97. The U.S. Court of Appeals for the Ninth Circuit has also held that, if the taxpayer succeeds in showing that the unreported income adjustment was arbitrary or erroneous, the burden of proof shifts back to the Commissioner to show that the determination was correct. See id. at 1005 (citing Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997), and Keogh v. Commissioner, 713 F.2d 496, 501 (9th Cir. 1983), aff'g Davies v. Commissioner, T.C. Memo. 1981-438); see also Helvering v. Taylor, 293 U.S. 507, 515 (1935).

---

[13]The Commissioner can rely on evidence that the IRS did not have when it issued the notice of deficiency. See Llorente v. Commissioner, 74 T.C. 260, 265 (1980), aff'd in part, rev'd in part, 649 F.2d 152 (2d Cir. 1981); Cook v. United States, 46 Fed. Cl. 110, 115 & n.10 (2000).

**[*27]**  Because we conclude that respondent's theories in this case are new matters

and we can resolve the substantive issues in this case on the basis of the allocation

of the burden of proof, we do not address whether respondent has satisfied his

burden of production under <u>Weimerskirch v. Commissioner</u>, 596 F.2d at 361-362,

or whether petitioners have shown that the unreported income adjustments were

arbitrary or erroneous under <u>Hardy v. Commissioner</u>, 181 F.3d at 1005 (citing

<u>Palmer</u>, 116 F.3d at 1312, and <u>Keogh v. Commissioner</u>, 713 F.2d at 501).[14]

---

[14]We note, however, that the record contains little reliable evidence concerning the amount of income that Mr. Close purportedly earned from the logging activities on the Winch Road and Nelson Loop Road properties.

With respect to the Winch Road property the summary exhibits that respondent introduced--with the possible exception of Exhibit 25-R, which is for other reasons inadmissible, <u>see</u> <u>supra</u> note 12--all relied on Mrs. Leach's reconstruction of Hidden Valley Ranch, LLC's business records.  However, Mrs. Leach, who is not a C.P.A., was operating under pressure from the IRS and the U.S. Attorney's Office, and under the circumstances of this case, we do not find her unsupported reconstruction to be reliable or credible.

With respect to the Nelson Loop Road property respondent introduced (1) a summary exhibit, Exhibit 36-R, of payments made to Hidden Valley Trust in 2003; (2) "check stubs" from Riley Creek Lumber Co. that show amounts paid to Hidden Valley Trust of $2,633, $14,889, and $1,599 in 2003; and (3) information from a Form 1099-S, Proceeds From Real Estate Transactions, from J.D. Lumber, Inc., reporting a payment of $637 to Hidden Valley Trust.  Revenue Agent Lewis testified that someone from HHS prepared Exhibit 36-R and that it was in the case file that she received from the criminal case.  When asked whether she verified the amounts listed in the summary, Revenue Agent Lewis testified that "some of the items were verified", but she did not say by whom.  We infer from Revenue Agent

(continued...)

**[*28]** C.     Burden of Proof Regarding Winch Road Property Income

In the notice of deficiency issued to Mr. Close respondent explained that the basis for the partnership income adjustment was that Mr. Close had passthrough income from Hidden Valley Ranch, LLC, in 2003.  Respondent alleged for the first time in a pretrial memorandum that Mr. Close had passthrough income from Lost Creek Partnership and alleged for the first time at trial that Lost Creek Trust is a sham.

Respondent concedes that the entity identified in the notice of deficiency-- Hidden Valley Ranch, LLC--never owned the Winch Road property nor any timber on that property.  Instead, respondent now asserts that Mr. Close had income from logging activities on the Winch Road property through Lost Creek Partnership because Lost Creek Trust is a sham.  The new theory, which is inconsistent with the determination in the notice of deficiency, requires different evidence, and it is therefore a new matter.  See Shea v. Commissioner, 112 T.C. at 197.  Because we conclude that respondent's theory that Lost Creek Trust is a

---

[14](...continued)
Lewis' testimony that she did not verify the unsupported amounts listed in Exhibit 36-R and that she did not know, and was not told, who prepared Exhibit 36-R, why it was prepared, or on the basis of what information it was prepared.

**[\*29]** sham is a new matter, respondent bears the burden of proof with respect to this theory.[15]  See Rule 142(a)(1); Shea v. Commissioner, 112 T.C. at 197.

D.      Burden of Proof Regarding Nelson Loop Road Property Income

In the notice of deficiency issued to Mr. Close respondent explained that the basis for the Hidden Valley Trust adjustment was that Hidden Valley Trust is a grantor trust.  Respondent first alleged that Hidden Valley Trust is a sham in a pretrial memorandum that was filed on November 9, 2012, less than three weeks before trial.

Respondent's theory that Hidden Valley Trust is a sham is a new theory that requires evidence different from evidence for the theory that respondent disclosed in the notice of deficiency, and it is therefore a new matter.  See Shea v. Commissioner, 112 T.C. at 197.  Accordingly, petitioners normally would bear the burden of proof with respect to the grantor trust theory,[16] and respondent bears the

---

[15]Although respondent failed to assert in the answer that Lost Creek Trust is a sham, see Rule 36(b), we conclude that the parties tried this issue by implied consent, see Rule 41(b).

[16]We conclude below, however, that respondent does not contend that the irrevocable share of Hidden Valley Trust is a grantor trust or that the revocable share included any interest in the Nelson Loop Road property after petitioners assigned their interest in the revocable share to the irrevocable share.  See infra part V.A.  Accordingly, the allocation of the burden of proof with respect to this issue is irrelevant.

[*30] burden of proof with respect to the sham trust theory.[17]  See Rule 142(a)(1);
Shea v. Commissioner, 112 T.C. at 197.

Having assigned the burden of proof, we turn to an analysis of the
applicable law as it relates to the issues presented.

III.    General Principles

A.    Sham Trusts

A taxpayer may elect a business form to minimize or altogether avoid the
incidence of taxation by any means that the law permits.  See Gregory v.
Helvering, 293 U.S. 465, 469 (1935).  However, a taxpayer may not structure a
paper entity to avoid tax when that entity is without economic substance.  Zmuda
v. Commissioner, 79 T.C. 714, 719 (1982), aff'd, 731 F.2d 1417 (9th Cir. 1984).
We have held that a trust, though valid under State law, may be treated as a nullity
for Federal income tax purposes if it lacks economic reality.  See Markosian v.
Commissioner, 73 T.C. 1235, 1241 (1980); Furman v. Commissioner, 45 T.C. 360,
364 (1966), aff'd, 381 F.2d 22 (5th Cir. 1967).

In Furman, we indicated that it was the "extreme case" where we would
disregard for Federal income tax purposes the existence of a trust valid under State

---

[17]Although respondent failed to assert in the answer that Hidden Valley
Trust is a sham, see Rule 36(b), we conclude that the parties tried this issue by
implied consent, see Rule 41(b).

**[\*31]** law.  See Furman v. Commissioner, 45 T.C. at 366; Downing v.

Commissioner, T.C. Memo. 2003-347, 86 T.C.M. (CCH) 738, 749 (2003).  In

Markosian v. Commissioner, 73 T.C. at 1243-1244, we looked to the following

four factors to determine whether a trust had economic substance:  (1) whether the

taxpayer's relationship to the transferred property differed materially before and

after the trust's creation; (2) whether the trust had an independent trustee; (3)

whether an economic interest passed to other trust beneficiaries; and (4) whether

the taxpayer respected restrictions imposed on the trust's operation as set forth in

the trust documents or by the law of trusts.  Accord Sparkman v. Commissioner,

509 F.3d 1149, 1155 (9th Cir. 2007), aff'g T.C. Memo. 2005-136.

    B.    Grantor Trusts

For purposes of the grantor trust provisions, see secs. 671-679, a grantor

includes any person to the extent that person either creates a trust or gratuitously

transfers property, directly or indirectly, to a trust, see sec. 1.671-2(e)(1), Income

Tax Regs.  If one person creates or funds a trust on behalf of another person, both

persons are treated as grantors of the trust.  See id.  The grantor of the trust is

taxed on the income of the trust under the grantor trust provisions if any of the

following conditions are met:  (1) the grantor possesses a disqualifying

reversionary interest, see sec. 673; (2) specified powers to control beneficial

**[\*32]** enjoyment of the corpus or income are vested in the grantor or certain other persons, see sec. 674; (3) certain administrative powers are exercisable by the grantor or a nonadverse party,[18] see sec. 675; (4) the trust can be revoked by the grantor or a nonadverse party, see sec. 676; or (5) trust income can be distributed to the grantor or the grantor's spouse or be used to pay for insurance on their lives without the consent of an adverse party, see sec. 677.

IV.    Winch Road Property Income

We examine Lost Creek Trust using the four-factor test that we applied in Markosian v. Commissioner, 73 T.C. at 1243-1244.

   A.    Petitioners and Mr. Leach's Relationship With the Winch Road
         Property

Petitioners and Mr. Leach did not own the Winch Road property before they purported to form Lost Creek Trust.  We therefore cannot compare their relationship to the Winch Road property before and after the formation of the trust.

---

[18]"[T]he term 'adverse party' means any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust.  A person having a general power of appointment over the trust property shall be deemed to have a beneficial interest in the trust."  Sec. 672(a).  "[T]he term 'nonadverse party' means any person who is not an adverse party."  Sec. 672(b).

**[\*33]** B.     <u>Whether Mr. Dixon Was an Independent Trustee</u>

Respondent did not call Mr. Dixon to testify and failed to introduce credible, probative evidence showing that Mr. Dixon was not an independent trustee. Additionally, respondent failed to solicit testimony from Mr. Leach or to produce other credible evidence with respect to (1) how Lost Creek Trust operated, (2) how Hidden Valley Ranch, LLC, operated, and (3) how the two entities interacted with each other.

C.     <u>Whether an Economic Interest Passed to the Trust Beneficiaries</u>

Assuming that Lost Creek Trust was validly formed, <u>see</u> <u>supra</u> note 11, the beneficiaries of Lost Creek Trust received an economic interest in the Winch Road property, which will presumably have some value even after its timber is harvested and the purchase price is fully paid. Mr. Leach testified that he and petitioners originally set up the trust to be a long-term investment for his and petitioners' children. Mr. Leach eventually took the position that the trust is a sham, but this was only after he was told to do so by Assistant U.S. Attorney Hall and Revenue Agent Ferrell. Respondent has introduced no credible evidence showing that petitioners in any significant way disregarded the beneficiaries' economic interest in Lost Creek Trust.

**[*34]** D.     Respect for Trust Restrictions

Respondent has introduced no credible evidence showing that petitioners disregarded any restrictions imposed by the Lost Creek Trust agreement or by the law of trusts in 2003.

The weight of the evidence generally supports finding that Lost Creek Trust is not a sham.  We therefore conclude that respondent, who carries the burden of persuasion on this issue, has failed to prove that this is the "extreme case" requiring us to disregard an entity valid under State law.  See Furman v. Commissioner, 45 T.C. at 366; Downing v. Commissioner, 86 T.C.M. (CCH) at 749.

V.     Nelson Loop Road Property Income

A.     Grantor Trust Theory

In the notice of deficiency issued to Mr. Close respondent determined that Mr. Close "received gross income from a grantor trust, Hidden Valley Irrevocable Trust."  On brief respondent contends that the revocable share of Hidden Valley Trust is a grantor trust but does not contend that the irrevocable share of Hidden Valley Trust is a grantor trust or that the revocable share included any interest in the Nelson Loop Road property after petitioners assigned their interest in the

[*35] revocable share to the irrevocable share.[19]  We therefore conclude that respondent has abandoned his determination in the notice of deficiency, and we will not address it.

Instead, respondent contends that we should disregard the transfer of petitioners' interest in the revocable share of Hidden Valley Trust to the irrevocable share of Hidden Valley Trust because petitioners continued to have unfettered access to Hidden Valley Trust's assets.  This contention is indistinguishable from respondent's sham trust theory for which respondent bears the burden of proof, see supra part II.D, and which we address below, see infra part V.B.2.

B.    Sham Trust Theory

Respondent contends that (1) the Court should on its own motion apply the doctrine of collateral estoppel to bar petitioners from contending that Hidden Valley Trust is not a sham and (2) the evidence shows that it is a sham.

1.    Collateral Estoppel

Respondent did not affirmatively plead collateral estoppel in the answer as required under Rule 39.  Respondent contends that this is because the District

---

[19]We infer that respondent concedes that the irrevocable share is not a grantor trust and that the irrevocable share formally held the Nelson Loop Road property after petitioners assigned to it their interest in the revocable share.

[*36] Court did not issue the final order regarding the Nelson Loop Road property until nearly five years after he filed the answer. But respondent does not explain why he failed to move to amend the answer. See Rule 41(a). Instead, respondent suggests that we should apply collateral estoppel even though the issue has not been properly raised in the pleadings.

Under the doctrine of collateral estoppel, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979). Collateral estoppel is a judicially created equitable principle the purposes of which are to protect the parties from unnecessary and redundant litigation, to conserve judicial resources, and to foster certainty in and reliance on judicial action. Id. at 153-154.

Before we may apply collateral estoppel in the context of a factual dispute, the following five conditions must be satisfied: (1) the issue in the second suit must be identical in all respects with the issue decided in the first suit; (2) the issue in the first suit must have been the subject of a final judgment entered by a court of competent jurisdiction; (3) the person against whom collateral estoppel is asserted must have been a party or in privity with a party in the first suit; (4) the parties

[*37] must actually have litigated the issue in the first suit and resolution of the issue must have been essential to the prior decision; and (5) the controlling facts and applicable legal principles must remain unchanged from those in the first suit. See Bussell v. Commissioner, 130 T.C. 222, 239-240 (2008); Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), aff'd, 904 F.2d 525 (9th Cir. 1990).

The Court may raise the issue of collateral estoppel on its own motion. See Arizona v. California, 530 U.S. 392, 412 (2000) ("'[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action sua sponte, even though the defense has not been raised.'" (quoting United States v. Sioux Nation, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting))); Monahan v. Commissioner, 109 T.C. 235, 250 (1997). However, "[w]here no judicial resources have been spent on the resolution of a question, trial courts must be cautious about raising a preclusion bar sua sponte, thereby eroding the principle of party presentation so basic to our system of adjudication." Arizona v. California, 530 U.S. at 412-413.

The issue of whether Hidden Valley Trust is a sham was not decided by the District Court. Rather, the District Court dismissed Ms. Loomis' petition to adjudicate Hidden Valley Trust's interest in the Nelson Loop Road property because the petition failed to allege a prima facie case. Accordingly, we decline to

**[\*38]** raise the issue of collateral estoppel on our own motion because "no judicial resources have been spent on the resolution of * * * [the] question" of whether Hidden Valley Trust is a sham.  See id. at 412.  Moreover, even were we to raise the issue of collateral estoppel on our own motion, we would conclude that collateral estoppel does not apply because the District Court never determined in a final order that Hidden Valley Trust is a sham.[20]  See Montana, 440 U.S. at 153.

### 2.    The Merits

We examine Hidden Valley Trust using the four-factor test that we applied in Markosian v. Commissioner, 73 T.C. at 1243-1244.

#### a.    Petitioners' Relationship With the Nelson Loop Road Property

Mr. Close testified that, after petitioners transferred their interest in the revocable share of Hidden Valley Trust to the irrevocable share of the trust, Triple C Ranch made lease payments of $2,000 per month to Hidden Valley Trust. Respondent did not introduce any credible evidence to rebut this testimony or to show that the lease payment was inadequate.[21]

---

[20]We also note that neither petitioner was a party to Ms. Loomis' petition to adjudicate Hidden Valley Trust's interest in the Nelson Loop Road property.

[21]The April 10, 2006, letter that Revenue Agent Ferrell sent to Mr. Close, see supra p. 9, contains vague references to various out-of-court statements of Ms.

(continued...)

**[\*39]**     b.     <u>Whether Ms. Loomis Was an Independent Trustee</u>

Respondent did not call Ms. Loomis to testify and failed to introduce any credible evidence showing that Ms. Loomis was not an independent trustee.

c.     <u>Whether an Economic Interest Passed to the Trust Beneficiaries</u>

The beneficiaries of the irrevocable share of Hidden Valley Trust received an economic interest in the Nelson Loop Road property because they are the formal beneficiaries of the trust pursuant to the amended Hidden Valley Trust agreement.  Additionally, Mr. Close testified that the logging proceeds were used to pay down the mortgage on the Nelson Loop Road property and to improve the property.  Respondent has introduced no credible evidence showing that petitioners in any significant way disregarded the beneficiaries' formal economic interest in the irrevocable share of Hidden Valley Trust.

d.     <u>Respect for Trust Restrictions</u>

Respondent has introduced no evidence showing that petitioners disregarded any restrictions imposed by the amended Hidden Valley Trust agreement or by the law of trusts.

---

[21](...continued)
Loomis.  However, respondent failed to call Revenue Agent Ferrell or Ms. Loomis to testify at trial.  We do not find the matters asserted in that letter to be credible or reliable absent testimony from Ms. Loomis, who allegedly made the statements.

[*40] The weight of the evidence generally supports a finding that Hidden Valley Trust is not a sham. We therefore conclude that respondent, who carries the burden of persuasion on this issue, has failed to prove that this is the "extreme case" requiring us to disregard an entity valid under State law. See Furman v. Commissioner, 45 T.C. at 366; Downing v. Commissioner, 86 T.C.M. (CCH) at 749.

VI.   Additions to Tax

    A.   Burden of Proof

The Commissioner bears the burden of production with respect to a taxpayer's liability for additions to tax and must produce sufficient evidence indicating that it is appropriate to impose the additions to tax. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner carries the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. See Higbee v. Commissioner, 116 T.C. at 446-447.

    B.   Additions to Tax Under Section 6651(a)(1)

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to timely file a return, unless it is shown that such failure is due to reasonable

[*41] cause and not due to willful neglect. See United States v. Boyle, 469 U.S. 241, 245 (1985); United States v. Nordbrock, 38 F.3d 440, 444 (9th Cir. 1994). A failure to timely file a Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence but nevertheless was unable to file the return within the prescribed time. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Circumstances that are considered to constitute reasonable cause for failure to timely file a return are typically those outside of the taxpayer's control, including, for example: (1) unavoidable postal delays; (2) the timely filing of a return with the wrong office; (3) the death or serious illness of the taxpayer or a member of the taxpayer's immediate family; (4) a taxpayer's unavoidable absence from the United States; (5) destruction by casualty of a taxpayer's records or place of business; and (6) reliance on the erroneous advice of an IRS officer or employee. McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997), aff'g T.C. Memo. 1995-547.

The parties agree that petitioners failed to timely file a Federal income tax return for 2003. Accordingly, if the Rule 155 computations show that petitioners were obligated to file a return for that year, see sec. 6012(a)(1)(A)(iv), respondent has carried the burden of producing evidence showing that the additions to tax under section 6651(a)(1) for 2003 are appropriate.

[*42] Mr. Close testified that petitioners failed to timely file their 2001 Federal income tax return because of difficulties they faced in preparing the return after the Government executed multiple search warrants with respect to Mr. Close's medical equipment business and the entity that purchased it in 2001. Mr. Close further testified that petitioners did not timely file their 2003 Federal income tax return because he thought that they first had to file returns for the earlier years. However, Mr. Close had no reasonable basis for this belief. We find that petitioners have not shown that they exercised ordinary business care and prudence with respect to their failure to timely file a 2003 return. Accordingly, if the Rule 155 computations show that petitioners were obligated to file a return for 2003, petitioners are liable for the additions to tax under section 6651(a)(1) for 2003.

C.     Additions to Tax Under Section 6651(a)(2)

Section 6651(a)(2) imposes an addition to tax for failure to pay the amount of tax shown on a taxpayer's Federal income tax return on or before the payment due date, unless such failure is due to reasonable cause and not due to willful neglect.[22] The section 6651(a)(2) addition to tax applies only when an amount of

---

[22]The amount of the addition to tax under sec. 6651(a)(2) reduces the amount of the addition to tax under sec. 6651(a)(1) for any month for which an

(continued...)

[*43] tax is shown on a return filed by the taxpayer or a section 6020 substitute for return prepared by the Secretary. Sec. 6651(a)(2), (g)(2); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003). Where the taxpayer did not file a return, the Commissioner must introduce evidence that a substitute for return satisfying the requirements of section 6020(b) was made. See Wheeler v. Commissioner, 127 T.C. 200, 210 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). A failure to timely pay the amount due on a Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence in providing for the timely payment of his or her tax liability but nevertheless was either unable to pay the tax or would suffer an undue hardship if he or she paid on the due date. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Respondent introduced certified Forms 4340, Certificate of Assessments, Payments, and Other Specified Matters, for each of petitioners' individual income tax accounts for 2003 that purport to show that respondent filed substitutes for returns for Mr. Close and Mrs. Close on April 20, 2006, and April 10, 2007, respectively, for 2003. However, respondent failed to introduce copies of any of the substitutes for returns. Because respondent has failed to show that petitioners

---

[22](...continued)
addition to tax applies under both paragraphs. Sec. 6651(c)(1).

[*44] failed to pay the tax shown on a validly executed return or section 6020(b) substitute for return that meets the requirements of section 6020(b), respondent has failed to satisfy the burden of proving that the additions to tax under section 6651(a)(2) for 2003 are appropriate. See sec. 7491(c); Wheeler v. Commissioner, 127 T.C. at 210. Accordingly, petitioners are not liable for the additions to tax under section 6651(a)(2) for 2003.

D.      Additions to Tax Under Section 6654

Section 6654 imposes an addition to tax on an individual who underpays his or her estimated tax. The addition to tax is calculated with reference to four required installment payments of the individual's estimated tax liability. See sec. 6654(c) and (d). Each required installment of estimated tax is equal to 25% of the "required annual payment". Sec. 6654(d). The "required annual payment" is equal to the lesser of (1) 90% of the tax shown on the individual's return for that year (or, if no return is filed, 90% of his or her tax for such year), or (2) if the individual filed a return for the immediately preceding taxable year, 100% of the tax shown on that return. Sec. 6654(d)(1)(A), (B), and (C). An individual has an obligation to pay estimated tax only if he or she has a "required annual payment". Wheeler v. Commissioner, 127 T.C. at 211-212; see also Mendes v. Commissioner, 121 T.C. 308, 324 (2003).

**[\*45]** There are two relevant exceptions to the applicability of the section 6654 addition to tax. First, the addition to tax is inapplicable if the tax shown on the individual's return for the year in question (or, if no return is filed, the individual's tax for that year), reduced by any allowable credit for wage withholding, is less than $1,000. See sec. 6654(e)(1). Second, the addition to tax is inapplicable if the individual's tax liability for the preceding taxable year was zero, subject to certain conditions.[23] See sec. 6654(e)(2).

Respondent introduced certified records showing that petitioners did not file Federal income tax returns for 2002 and 2003 and made no estimated tax payments for 2003. However, respondent also introduced certified Forms 4340 for each of petitioners' individual income tax accounts for 2002 that each show no tax assessed, no payments made, and an account balance of zero. The Forms 4340 further show that respondent filed a substitute for return for Mr. Close but did not file a substitute for return for Mrs. Close for 2002. The Forms 4340 do not show that respondent issued a notice of deficiency to either petitioner for 2002. We therefore conclude on the preponderance of the evidence that the section

---

[23]The preceding taxable year must have been a taxable year of 12 months, and the taxpayer must have been a U.S. citizen or resident throughout the preceding taxable year. See sec. 6654(e)(2).

**[\*46]** 6654(e)(2) exception applies.  Accordingly, petitioners are not liable for the additions to tax under section 6654 for 2003.

VII.  <u>Conclusion</u>

This case would have benefited from a more fully developed record regarding the creation, funding, and administration of Lost Creek Trust and Hidden Valley Trust; the conduct of logging operations on both the Winch Road and Nelson Loop Road properties; the use and amount of the income generated by the logging activities; and the acquisition of and payment for the two properties.  This case would also have benefited from the earlier assertion and development of respondent's sham trust theories.  Unfortunately, respondent chose to rely on actions taken in connection with Mr. Close's criminal case and particularly the Government's misguided attempt to position itself for an easy forfeiture of the trusts' assets.  The resulting product was poorly developed and unconvincing.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the parties' concessions and the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.